UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES

    -v.-

RICHARD MELTZ

          Defendant.

**S5  12 Cr. 847 (PGG)**

**Government's Sentencing Memorandum**

PREET BHARARA
United States Attorney for the
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Brooke E. Cucinella
Hadassa Waxman
Assistant United States Attorneys
    *Of Counsel*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES

    -v.-

RICHARD MELTZ,

          Defendant.

**S5 12 Cr. 847 (PGG)**

**Government's Sentencing Memorandum**

**I.**    **Background**

    The Government respectfully submits this submission in connection with the sentencing of defendant Richard Meltz, scheduled for September 16, 2014.  Having presided over the trial of co-defendants Michael Van Hise and Robert Christopher Asch, the Court is uniquely aware of the facts here.  Meltz, a former law enforcement officer, participated in two separate kidnapping conspiracies: one involving Van Hise's wife, sister-in-law, daughter and nieces, all of whom are under the age of 10, and the other involving a female undercover agent of the Federal Bureau of Investigation, posing as a potential kidnapping target (the "Female Undercover").

    As described in greater detail below, in light the nature of the offense, including Meltz's discussions about his desire to kidnap and kill children, and his willingness to use his law enforcement background to advise co-conspirators on critical aspects of the kidnapping plan, the imposition of a sentence of 120 months' imprisonment (the Stipulated Guidelines Sentence set forth in the parties' plea agreement, and a sentence far, far below the stipulated Guidelines range of 292 to 365 months) is sufficient, but not greater than necessary to achieve the legitimate purposes of sentencing.  Moreover, in light of Meltz's failure to accept responsibility for his criminal conduct, as evidenced by his sentencing submission, and his letter to Your Honor in support of that submission, in which he continues to maintain that he was engaged in fantasy

role-play and did not intend to actually harm real women, in direct contravention of his guilty plea under oath before this Court and his plea agreement with the Government, the Government does not intend to move at sentencing for Meltz to be credited for the third acceptance point pursuant to U.S.S.G. § 3E1.1(b), and believes that Meltz is not entitled to the two-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a).

## II.    The Offense Conduct and Plea

On April 15, 2013, Meltz was arrested on a complaint charging him, together with Asch and Van Hise, with participating in a conspiracy between 2011 and April 15, 2013, to kidnap specific and identified women and children, in violation of Title 18, United States Code, § 1201(c).  The women included Van Hise's wife and sister-in-law, and a female undercover agent (the "Female Undercover") from the Federal Bureau of Investigation ("FBI") who was posing as a kidnapping target.  The children included Van Hise's minor daughter and four minor nieces.  Meltz and his coconspirators were indicted shortly thereafter, and a series of superseding indictments followed.

On September 18, 2013, a Grand Jury sitting in this District returned Indictment S4 12 Cr. 847 (PGG), charging Van Hise, Meltz, and Asch with two separate kidnapping conspiracies in violation of §1201(c). Count One charged Van Hise, Asch, and Meltz with participating in a conspiracy between spring 2011 through January 2013 to kidnap, rape, and kill members of Van Hise's family. Count Two charged Asch and Meltz with conspiring between January 2013 and April 15, 2013, to kidnap, rape, and kill the Female Undercover. On January 16, 2014, Meltz entered a plea to S5 12 Cr. 847 (PGG) (the "Superseding Information")  charging him in two counts with participating in kidnapping conspiracies in violation of Title 18, United States Code, § 371.  As to Count One of the Superseding Information, Meltz stated that he "engaged in a

number of email and other conversations with Christopher Asch regarding the kidnapping of an adult relative of Michael Van Hise.  I gave advice to Mr. Asch and assisted in the planning of the kidnapping. . . I knew that I was assisting in a criminal conspiracy." (Plea Tr., 27).   As to Count Two, Meltz stated, that he "engaged in discussions with Asch and others about kidnapping an adult woman…  I gave advice and assistance in the planning of the kidnapping. I knew that I was assisting in a criminal conspiracy." (Plea Tr., 27).  Van Hise and Asch proceeded to trial.  Both were convicted as charged.

### A.    Offense Conduct

As Your Honor is aware from the trial of Van Hise and Asch, the investigation began in October 2012,  after the FBI learned that Van Hise was sending electronic mail and instant messages to solicit individuals to kidnap, rape, and kill his wife and daughter, as well as his sister-in-law and her children. Pursuant to Court-authorized search warrants, members of the FBI reviewed communications from Van Hise's e-mail account to Asch, a former New York City public high school librarian, and Meltz, then-Chief of Police at the U.S. Department of Veterans Affairs, Bedford VA Medical Center in Massachusetts, about their shared objective to kidnap, rape, torture, and kill (referred to in the communications as "snuffing") women, children, and infants, including specific members of Van Hise's family.

At trial, the evidence showed that Asch and Meltz met in 2008, and began emailing in June of that year about a potential kidnapping:

> **Asch**: i understand the need for discretion so please don't worry. i too have been looking for a partner or partners for a long time. actually, it's not that hard to find a partner, but one you can trust and isn't reckless, deeply depressed or abusing drugs is a lot more difficult. my fantasies also run very dark and deep. i don't have any experience, principally because i haven't felt i could do a scene safely and because i have no interest in being caught. iwouldlove to be able turn some of these fantasies into realty and have stayed hopeful that it'll be possible to meet some guys like myself.

3

**Meltz:** I have no desire to be caught either so we are on the same page there. When we talk we can discuss various scenarios and methods that interest us. I am not reckless, deeply depressed or a drug abuser. I am into working out, keeping strong. Finding a real partner is very very difficult. There is much we can discuss and talk about. I am looking forward to talking with you . . .

On June 24, 2008, after an apparent telephone conversation, Asch and Meltz continued to exchange emails:

**Asch**: it was great talking with you today! i'm looking forward to talking again and discussing fantasies and possible plans so feel free to call when the opportunity arises. it sounds like you know yourself pretty well and have fully thought through the various emotions that come up. even if we never get to actually put anything into reality it will be fun to plan. i have a feeling this is the start of something good and that we will eventually have the chance to do some scenes.

**Meltz:** I also felt very good and relaxed talking to you, which is not the usual case with me. I am looking forward to actually meeting and seeing where it goes from there. I will send another email later when I have more time.

After establishing a relationship of trust, Meltz and Asch began to look for other like-minded men to join their group. They found Van Hise who shared their interest in kidnapping and torturing women and children, and began communicating with him, as well. During the summer of 2012, Meltz and Van Hise discussed, over email, the kidnapping of members of Van Hise's family, including the children:

On June 30, 2012:

**Van Hise**: glad to hear it and her friend i think might live with her so im gonna see if i can get her pic as well. also would you help me do my sis in law and her kids i can describe them to you

**Meltz:** oh yes to do family is a special treat she would certainly let you in and she would trust you until she felt thecordtighening around her lovely neck

On July 12, 2012:

**Van Hise**:  . . . what would you do with the 9 year old my sis in laws kid I want to hang

4

**Meltz**:  you want to hang the 9 yo?  that gets me hard to think about. I would rather manually choke her but hanging is nice also

**Van Hise**:  she has 4 kids i just want her and the 9 [year old] only  the 9 i want to rape and hang and rape whils she hangs but i want to turn her into the 3 way interested than as she dies we make the sis in law watch than rape and s[t]rangle the sis in law.

**Meltz**:  damn I like the way you think

\* \* \*

**Van Hise**:  . . . how do you propose we grab my sis inlaw

**Meltz**:  we go over there she knows you let's us in we choke her out tie her up throw her in the back of your car take her someplace and slowly do her

\* \* \*

**Van Hise**:  i like that idea or we could go in the moms house while she and the kids sleep tie her up and smother her till out than take her and put her in the car and grab the kids realfast telling them we have somewhere to go than kill them . . .

In October 2012, the FBI approached Van Hise, who agreed to discuss his communications with Meltz and Asch. Van Hise admitted that he e-mailed to Meltz and Asch photographs of his wife, sister-in-law and minor children, and that Meltz and Asch both expressed interest in kidnapping and raping the women and children.  In December 2012, at the request and direction of the FBI, Van Hise emailed Meltz and Asch, and introduced "Darren," an FBI agent working in an undercover capacity and who claimed to have an interest in kidnapping and raping women.  Darren then began communicating directly with Meltz and Asch.  In February 2013, because Asch had previously suggested to Darren certain methods of identifying random female victims to kidnap and in the interest of public safety, Darren proposed targeting a specific female, who was actually a female undercover agent.

On or about February 8, 2013, a federal judge in this District authorized the interception of wire communications over the home telephone of Asch.  Pursuant to this Order, the FBI intercepted numerous telephonic communications between Asch and Meltz in February, March,

5

and April 2013, during which Meltz provided to Asch strategic advice on how to successfully kidnap and murder women.  For example, on February 22, 2013, Asch and Meltz had the following conversation:

> **Asch:** I just wanted to catch you up. I've been meeting with Darren and finally met his friend last week.  So, you know, he's got somebody in mind that he wants to do, so I wanted to see what your situation was, and, this would be something that we're still planning for.  They've been kinda staking her out and taking pictures and all that kind of stuff.

>                                                \*   \*   \*

> **Asch**: . . . Anyways, this is the ex-wife of a buddy of [Darren's friend] and she lives in Hoboken kinda in an isolated area, I mean, I thought Hoboken was pretty urban...

> **Meltz**: I thought, yeah. . .

> **Asch**: At any rate, [Darren's friend] lives upstate a bit, up in the Hudson Valley, and I guess he's got a place to bring her and that kind of thing.  So anyway, I'm kinda getting together some equipment and stuff, and um, so that's what we're thinking of doing.  We wanted to see if you were interested in meeting them.

> **Meltz**: Well, it's a very exciting proposition when you think about it.  Can I strangle her?

> **Asch**: Um, I think [Darren's friend] wants to hang her.

> **Meltz**: Oh.

> **Asch:** I think, uh, you know, well it depends, if they do the takedown and stuff, I guess, you know, I have no problem with [Darren's friend] doing it...

>                                                \*   \*   \*

> **Asch**:  I'm open to other things as well, other methods   (laughing).

> **Meltz**:  I like that, too, yeah.  Very, very, very exciting.  To think about meeting a group like that.

> **Asch**: Yup.

> **Meltz**:  Wow.

**Asch**:  At any rate, it turns out [Individual-1] in Boston, Darren did talk to him, and [Individual -1] said he didn't think he could really go through with it, which was a surprise to me

**Meltz**: Oh

**Asch**:  So I'm sort of leaving him out of the picture at the moment.  I mean, we're glad that he told us, ahead of time, but it doesn't sound like he could really go through with it . . . Then there's [Individual-2], and he said he might be able to, schedule's flexible enough that he might be able to get here to do something.  But again, I'd also like to meet him before actually doing anything.  But we're also trying to do things like divide up the responsibilities, and stuff, they're very, again, their military training, each person is responsible for something or other.

**Meltz**:  Correct, and then as long as everybody does their job the plan goes well.  And if not you have to improvise along the way but if you have that background it's easier to improvise.

Later in the conversation, Asch asked Meltz if he had ever tried before to get a "taser gun," and stated that he may look online for one.  Meltz explained that it may be easier to get one in "Pennsylvania, like for a gun show or something, they have all kinds of different things and weapons, even tasers.  I know knives, you just walk up there, pay your money, and walk away with something and there's no record or anything of it."  Meltz also warned Asch about the risks of looking for a weapon online.

On March 3, 2013, Meltz and Asch had another conversation about kidnapping the Female Undercover and other potential victims. The following is an excerpt from that conversation:

**Meltz**: So, I did get an opportunity yesterday to do some cruising around and stuff.

**Asch**:  Yeah.

**Meltz**:  Nothing happened, but it was exciting picking out potential[ ] [victims].

**Asch**:  Yeah.  And where did you go?

**Meltz**:  Well, I was just, you know, up in parts of New Hampshire . . .Yeah, that's where basically we stayed.  I cruised a little bit down into Massachusetts. So, uh, what's new with you?  What's going on?

**Asch**:  Uh, well we're still trying to plan something here, uh, I think I told you I met with Darren and [his friend], and uh, that was a good meeting, and uh, so we're you know we're trying to get to know each other, and uh, try to plan something. Uh, this uh bitch that [Darren's friend] has in mind is the ex-wife of a buddy of his.

**Meltz**:  Right, right. You told me about that.

**Asch**:  Yeah, and uh, anyway I went on some sites to look for like stun guns and stuff. And, I know we talked about that last time, but uh, looks like they won't deliver it to states where it's illegal, you know, to own them so New York, New Jersey, and so forth, uh, you can't...

**Meltz**:  Oh absolutely, they will not.  Nope.

**Asch**:  No ... So, uh, I guess what we'd have to do is uh go to a gun show.  And uh, so I just wanted to uh see, you know, when you might be, uh, coming down here ... and where they ... I did look online but now I can't remember when they're gonna be held, but there's some in like the Lehigh Valley I think in Pennsylvania?

**Meltz**:  Right, there's Mount Bethel, Pennsylvania.  They hold one once or twice a year. And, there's should be coming up.  I think that it's in April.

**Asch**:  Uh huh.  And I think that there's some in New Hampshire.  I didn't look too closely, but uh...

**Meltz**:  You know what I could ... it didn't even dawn on me.  I could walk into a gun shop.  There's hundreds ... here . . . And just, and just see what's available, and what you have to do to buy one . . .The whole nine yards.  I can certainly investigate that part of it.

* * *

**Asch**:  Right.  Uh, just trying to think of, uh, how to keep it from screaming and being heard, you know...but uh . . .A taser would be uh, you know, would be good.  But.

**Meltz**:  That would be optimal in most situations.  And I know, uh, guys who have used it before.

**Asch**:  Yeah.  Have you seen them demonstrate it?  I mean, do you know if there's a difference in the amount of voltage and so forth, that uh.

8

**Meltz**:  I certainly see ... I've only seen one demonstrated . . . And the voltage was enough where once it hit, it just ... they're just silence and stunned . . .It's not.  It's not.  They just go down.  It's not even a situation of screaming or anything else.

**Asch**:  Yes, yeah.  That's what I thought would be the safer thing, you know, Uh.  Because then they could just grab it.  It doesn't seem to be very heavy, you know, and just uh.

**Meltz**:   Well, it's not heavy.  I mean, it depends...there are tasers that shoot.  You can get a taserthat shoots 25 feet, or 30 feet . . .And it's attached to the wires.  But, you can also get tasers that you just walk up behind and zap them ... and it's ... it'll knock somebody out . . . For a couple of ... about 30, 40 seconds it'll just make them completely limp . . . And that should be enough.  But then after that, you know, you're still talking about timing.  And even in a military operation, it's, it's gonna be kind of tough to get the timing down.

Several weeks later, Meltz and Asch spoke again about the kidnapping plan, and specifically

about the purchase of a stun:

**Meltz**: Did you hear anything from Darren and company?

**Asch**: I'm actually going to go down to that [gun] show in Allentown on Saturday, I'm going to take the bus down, and go to that, see what I can find, and then we'll see.  Then, you know, we'll meet and stuff, we still have lots of things to work out.  I think we need to answer the big question, which is can the three of us carry this off  or is it too big of an operation and should we wait until    [Darren's friend] comes back.  He's going back to the Middle East, I think, in May, for about a month, a month and a half.  He wants to do it before he goes but it just may make sense to put it off and wait until he comes back.  So, we'll see.  I don't know.

                                        *   *   *

**Asch**: Yeah, so, anyways, I went to Home Depot and picked up some things I thought we could use, like duct tape and a bucket, and some cable ties, and I've been getting toys and stuff, I've ordered some things through the mail so I got a couple of speculums and I got another mouth gag and so, been collecting stuff like that.  At any rate.  Got some masks.

**Meltz**:  There you go.  You don't want to be recognized, either.  So that's one of the good things about that.

**Asch**: Although it's getting to be the wrong time of year to  be wearing masks but.

9

**Meltz**: And you're absolutely correct.  Soon it will be too warm out to really justify wearing gloves . . . So it's just going to have to be something you put on just prior to.

**Asch**: Yeah.  So, I think we just have to think.  This is a fairly high-risk operation.  I mean, as far as I'm concerned.  Trying to snatch somebody off the street, home invasion, I think they're pretty high-risk.  So, I think we just have to kinda think whether we can do it or whether we should have more people involved.

**Meltz**: But the difficulty with more people is you never know if you're going to get that weak link who's going to cave in or whatever.

**Asch**: I think that it's a matter of, even if we do meet some new people, it's going to take some time to get to know them and trust them and so forth, so it could be a while but I think it will be worth it.

\* \* \*

**Meltz**: I've been doing some hunting up here and so far not successful but I've been looking and seeing things and you know, working with ... So.

**Asch**: Well, the thing is, when I was talking about risk. There is risk just in trying to snatch somebody off the street and not be seen and stuff, but also, she will attract attention, she will be missed and she will end up in the press and, you know, so that's its own kind of, intense, thing, and there will be a full investigation.

**Meltz**: Correct.

\* \* \*

**Meltz**: It's interesting to see how these things are solved.  It's not always with forensics. But the vast majority of the time, like, if they ever find, what's her name, if they go after her body, now they get forensics and if anybody has like, Darren or [Darren's friend], apparently if they're in the military, they have their DNA on file in their national bank. They might not even think that.  But they do.  Because our military injuries, they get blown to bits, they want to be able to ID them.  So that's why they have their DNA.  So if these guys get careless in any way shape or form, if they leave blood at the scene, if she struggles or whatever it might be, DNA is like, extremely effective.  Except for OJ, he got away with it.  But everybody else gets nailed.

**Asch**: Right.  Well, I didn't realize that the military was doing that as a matter of course but I guess that makes sense.  They would want it to identify remains and stuff, you know.

**Meltz**: That's actually why.  They have this DNA bank now.  And if these guys do something and leave a blood trail, or leave something behind, or skin under some nails or whatever it might be, they have to be particularly careful because, as opposed to you, who's never been tested or had DNA samples taken, they have.

10

**Asch**: Yeah.  The only thing I have are fingerprints through the Department of Education, but . . .

**Meltz**: Correct.  But that's easy, you just wear gloves and you don't have fingerprints . . . So, I mean, that's not even a little problem.  The big problem is the DNA.  You know. As we said, murder is easy, getting away with it is not.

**Asch**:  Right, right.  Yeah, well, I don't know.  I think we have to think long and hard about whether we should try to    do this soon or whether we should wait.  I mean we will try
to minimize risk like having the stun gun and so forth.

**Meltz**: Every time you do anything it's a risk.  And like you said, all you can try to do is minimize it . . . Because the end result is going to be fantastic.

\*   \*   \*

**Meltz**:  It's challenges, but they're exciting challenges to work through . . .That's all a matter of part of the excitement, the  enjoyment, is setting the whole thing up.  You prey, some prey is not going to be, it's going to be much easier to get to, than other prey.  And it's just a matter of either luck or plans and eventually it happens.

**Asch**:  Yup.  Well, and it's timing, too, and I think we just   have to consider all those factors, you know.

**Meltz**: Yup.  You're absolutely right.  It's timing, too.    It's a matter of getting everything in.  When I was on the hunt, and even up here, I'm an old guy, but I'm still looking, when you're on a hunt most of this is going to  turn out to be fruitless in the end but the excitement and the adrenaline rush is incredible when you're hunting some      prey and they have no idea or concept that they're being followed.  They're just in their own little nitwit world.  On the phone doing what they have to do.  They have no concept that within minutes or seconds they could be fighting a futile fight for their life  . . . And that's all part of it.  That's part of the    excitement and thrill, too. But again, I can only say that     the vast majority of hunts turn out to be no good.  And that's why it would be great if you and I were together, to     go out and just hunt, because this way we have that     opportunity.  You know, if it turns out good, this way you may see something that I don't see, I see something you     don't see.  And we give ourselves a signal and we go for it.

**Asch**: Yeah, that's why I like the idea of partners or a small group because there's more eyes to keep watch, there's more arms to restrain, and, as long as you can trust the guys you're working with, I think it just makes sense.

**Meltz**: Yup.  I agree with you 100%.  It's a matter of working together, it's a matter of trust, it's a matter of   a lot of different things.  But it's something that really, again, if you can get one person, if you can get two or      three, that's fantastic.  Like you've got a group of three, there's no prey that's going to be able to get out of that.  Once you make your move.

**Asch**: Yeah.

**Meltz**: Even two you could overpower anyone.  So, um, and it's funny, once you get that ligature around their neck, whether it's a tie, cord, whatever it might be.  Some fight like hell, others just surrender.  They just sit there and hold onto it.  Just, "what are you doing, what are you   doing, please stop..." (UI) back and you're done.  Now, it's so individual in that basis, too, they all deserve it.  They all should get it.

In addition, the FBI intercepted numerous other phone calls in which Meltz provided advice, information, and assistance to Asch on how to avoid detection and minimize the risks associated with abducting and murdering a woman.  Examples of the techniques suggested by Meltz included avoiding toll roads, using rental cars, paying for "tools" in cash, looking for victims in desolate areas who were distracted with their cellphones, abducting victims at night, and using disguises when first approaching a potential victim.  Meltz also reported back to Asch on his two attempts to purchase a taser gun on his own—reporting that he could not do it because he did not yet have a New Hampshire license.  Because Meltz could not secure the gun, and based on advice provided by Meltz, Asch eventually traveled from New York to Allentown, Pennsylvania, where he purchased a stun gun to use during the kidnapping.

On or about April 11, 2013, Darren placed a recorded call to Meltz to arrange an in-person meeting to discuss the kidnapping of the Female Undercover.  During that call Meltz told Darren that **"**I would just like to get you your first experience doing someone all the way."

After a number of conversations about kidnapping and violence against women, Meltz and Darren agreed to meet at a location in New Jersey, and on April 14, 2013, Meltz met Darren.  At the meeting, Meltz and Darren discussed, among other things, the kidnapping and murder of

the Female Undercover. Meltz advised Darren on how best to dispose of the Female

Undercover's body, including how to transport it from the crime scene to a desolate location in

the woods in upstate New York. Meltz told Darren that given the warm weather wild animals

would likely find the Female Undercover's body and destroy it before law enforcement could

find it.  Meltz left the meeting and was arrested.

**B.      The Guilty Plea**

On January 16, 2014, Meltz pled guilty before Your Honor to the Superseding

Information, which charged him in two counts.  Count One charged Meltz with participating in a

conspiracy between the spring of  2011 through January 2013 to kidnap a woman, who was

identified in the Information as "Victim-1,"  in violation of Title 18, United States Code, § 371.

Count Two charged Meltz with conspiring between January 2013 and April 15, 2013, to kidnap

the Female Undercover, also in violation of Title 18, United States Code, § 371.  Sentencing is

scheduled for September 16, 2014.

**C.      The Sentencing Submission**

In his sentencing submission dated July 23, 2014, Meltz seeks a sentence of time served

arguing that, notwithstanding his guilty plea, his conduct was more in the realm of fantasy than

reality:  "[e]ssentially, Mr. Meltz was charged for participating in chats, emails and other

discussions that began as fantasy and later ventured too close to reality."  In his submission,

Meltz goes on to use quotes around the term "plans," suggesting, again, that despite his plea

allocution, there were no actual conspiracies here—stating, instead, that "it is the

[G]overnment's position that the planning was real, and focused on real-world targets."  Meltz

then attempts to liken himself to Gilberto Valle, whose conviction was recently overturned by

this Court (a decision that, as Your Honor is aware, the Government is appealing).  In comparing

himself to Valle, whose conviction the Court overturned, Meltz ignores a number of things, including, significantly, his guilty plea. He did not plead guilty to fantasizing online—which is not a federal crime—but to conspiracy to commit kidnapping. Meltz states that "he never went anywhere connected with a kidnapping, never obtained any equipment himself for use in the conspiracy…" and that "his guilt is based on what he told the Court he intended the eventual outcome of this conspiracy to be: an actual abduction."

The submission goes on to state that this intent is in stark contrast to the years Meltz spent in law enforcement—but it is "nonetheless, what he admitted to." These statements are not only factually incorrect, they are disingenuous given the background of this case and the evidence that would have been presented at trial had Meltz chosen to fight these charges and actually pursue a so-called "fantasy" defense, as his now-convicted co-conspirators chose to do. Meltz's guilt is not based solely on what he told the Court, but on the agreement he made with his co-conspirators, and the actions he took in furtherance of those agreements. He stated in his allocution—while under oath—that he knew he was "assisting in the planning of a kidnapping." The Court then engaged in the following colloquy with defense counsel:

> THE COURT: Mr. Brill, do you know of any valid defense that would prevail at trial or any other reason why Mr. Meltz should not be permitted to plead guilty this evening?
>
> MR. BRILL: No. I do not, your Honor.
>
> THE COURT: And do you believe there is an adequate factual basis to support a guilty plea?
>
> MR. BRILL: Yes, your Honor.

And indeed, there is. If Mr. Meltz had gone to trial, the Government would have introduced numerous calls between Asch and Meltz, as well as between Meltz and "Darren"

14

about Meltz's desire to hurt women, and his fear of getting caught. While the Court heard many

of these calls during the trial of Meltz's co-conspirators, there are many that the Court did not

hear—as Meltz exercised his right not to go to trial. Meltz discussed using disguises to sneak up

on women traveling alone in parking lots; he went into detail about the satisfaction and pleasure

that can be derived from squeezing a woman's neck to the point that her bones are crushed; and

he expressed his desire to provide Darren—a man who made clear, over and over again, that this

was not a "fantasy" for him—with his first kill, and suggesting an elderly woman who lived

down the street from Meltz's wife as a victim (thereby distancing Meltz as a potential suspect).

Meltz's sentencing submission, and his email letter to the Court in which he both claims to

accept responsibility and then goes on to write about his "make-believe online persona" and the

people who were not victims but people "he chatted about," show a lack of acceptance of

responsibility. Accordingly, the Government, at this time, does not move for an additional one-

level reduction for the acceptance of responsibility. *See United States* v. *Lee*, 653 F.3d 170, 173

(2d Cir.2011) (Holding "[a] government motion is 'a necessary prerequisite' to the granting of

the third point" under § 3E1.1(b)" (quoting *United States* v. *Sloley*, 464 F.3d 355, 359 (2d

Cir.2006)); *see also* U.S.S.G. § 3E1.1, cmt. n. 6. Indeed, the Government respectfully submits

that it would be appropriate under these circumstances to deny Meltz any credit for acceptance of

responsibility.

### III.   The Stipulated Guidelines Calculation

The parties stipulated in the plea agreement that because Meltz conspired to commit

kidnapping in violation of 18 U.S.C. §1201(c), the calculation of his base offense level, and any

adjustments for his intended offense conduct, was governed by the Guideline provisions

applicable to kidnapping offenses set forth in U.S.S. G. § 2A4.1. As to Count One, the parties

15

agreed that Meltz's base offense level is 32, and that the following enhancements applied: (i) because Meltz intended to inflict permanent or life-threatening injury on the intended victim, the base offense level is increased by 4 levels; and (ii) because Meltz intended to sexually exploit the intended victim, the base offense level is increased by 6 levels.  The parties further agreed that Meltz is entitled to a 3-level reduction in the base offense level pursuant to U.S.S.G. § 2X1.1(b)(2), because neither Meltz nor his coconspirators completed all of the acts necessary for successful completion of the planned kidnappings.  As such, the stipulated offense level for Count One is 39.  As to Count Two, the same offense level analysis applies, and an additional two offense levels are added pursuant to U.S.S.G.§ 2A4.1(b)(3) because the coconspirators intended to use a dangerous weapon—specifically a stun gun—during the planned kidnapping. Thus, the stipulated offense level for Count Two is 41.  Because Meltz pled guilty to two separate kidnapping conspiracies, two additional levels are added to the combined offense level pursuant to U.S.S.G.§ 3D1.4(a).  At the time of the agreement, because of the expected timeliness of Meltz's guilty plea and presumed acceptance of responsibility, the Government believed he would be entitled to a 3-level reduction pursuant to U.S.S.G. § 3E1.1.  Thus, the stipulated Guidelines offense level for Count One and Two is 40.  Meltz has no criminal history, and is therefore in Criminal History Category I.  Based on these calculations, Meltz's stipulated Guidelines range is 292 to 365 months' imprisonment.  As noted above, because Meltz's sentencing submission and letter to the Court nullify any acceptance of responsibility, the Government no longer intends to move for the third point reduction at sentencing, and believes Meltz also should not be credited the two-level reduction for acceptance.  Accordingly, the Government respectfully submits that the correct Guidelines offense level for Counts One and Two is 43, which would increase Meltz's Guidelines sentence to life imprisonment.  Because,

16

however, each count to which Meltz pled guilty carries a maximum sentence of 60 months, the

effective stipulated Guidelines sentence is 120 months' imprisonment.

## IV.    Discussion

### A.    Applicable Law

 The Guidelines still provide strong guidance to the Court in light of *United States* v.

*Booker*, 543 U.S. 220 (2005) and *United States* v. *Crosby*, 397 F.3d 103 (2d Cir. 2005).

Although *United States* v. *Booker* held that the Guidelines are no longer mandatory, it also held

that the Guidelines remain in place and that district courts must "consult" the Guidelines and

"take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated,

"a district court should begin all sentencing proceedings by correctly calculating the applicable

Guidelines range," which "should be the starting point and the initial benchmark." *Gall* v. *United*

*States*, 552 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined

in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense

and the history and characteristics of the defendant" (§ 3553(a)(1)); the four legitimate purposes

of sentencing (§ 3553(a)(2)); "the kinds of sentences available" (§ 3553(a)(3)); the Guidelines

range itself (§ 3553(a)(4)); any relevant policy statement by the Sentencing Commission

(§ 3553(a)(5)); "the need to avoid unwarranted sentence disparities among defendants"

(§ 3553(a)(6)); and "the need to provide restitution to any victims" (§ 3553(a)(7)).  *Gall* v.

*United States*, 552 U.S. at 50 n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence

sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within the Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita* v. *United States*, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 552 U.S. at 46; *see also Rita* v. *United States*, 551 U.S. at 349. To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Gall*, 552 U.S. at 50.

**B.     Imposition of the Stipulated Guideline Sentence of 120 Months' Imprisonment Would Be Sufficient, But Not Greater Than Necessary, To Achieve The Legitimate Purposes Of Sentencing.**

Most fundamentally, the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), weigh heavily in favor of the statutory maximum sentence of 60 months for Count

One and Count Two, to run consecutively, for a total sentence of 120 months' imprisonment. The seriousness of the crime for which the defendant was convicted is beyond dispute; though an actual kidnapping did not occur, the plans that Meltz helped to put in motion were horrific, involving the torture and rape of innocent women and children, and were motivated by sexual gratification and misogyny. Meltz provided detailed and strategic advice on how to commit a kidnapping and murder without getting caught. He traded on his experience and knowledge as an officer of the law. As noted, he provided advice on where to buy a stun gun; how to dispose of a body; the importance of using cash to buy instrumentalities of torture; the danger of leaving DNA evidence; avoiding toll roads when transporting the victim; and other ways to avoid detection by law enforcement.

Meltz gave this advice to men who said that they were serious about abducting and brutalizing women and children, and who had specific and identified targets in mind. Meltz knew that each of the targets was accessible to his coconspirators. Van Hise made clear in his communications that he knew where his wife, sister-in-law, and the minor children lived, and that he had access to them. Asch said that he had surveilled the kidnapping target at her workplace, and that other "coconspirators" knew where she lived and surveilled her near her home. Because Van Hise and Asch claimed to be serious about their plans for violence, and had identified real and accessible targets, Meltz had no reason to doubt—and every reason to believe—that the coconspirators would act on his advice, and commit an actual kidnapping, involving humiliation, fear, torture, sexual abuse, and death. Meltz attempts to downplay the role he played in this conspiracy and, in doing so, ignores what is, of course, a basic feature of conspiracy law that a coconspirator can draw himself into the scope of a conspiracy merely by providing advice and assistance in planning a crime. *See, e.g., United States* v. *Brady*, 26 F.3d

19

282, 284 (2d Cir. 1994) (describing traditional structure of leadership of La Cosa Nostra family to include a "consiglieri, who advises lower ranking family members and mediates disputes between them").  Here, Meltz did just that, and then went even further—he attempted to find a stun gun and he suggested potential victims to co-conspirators who he knew intended to kidnap, rape, torture and kill a woman.

In addition, during the time that Meltz was giving advice, and assisting in the planning of a brutal kidnapping and murder, he was a sworn law enforcement officer, charged with protecting members of the public, and trained in the criminal law and investigative techniques. Instead of using his law enforcement background for the public good—as he was sworn to do— he drew on that experience to help plan a gruesome and brutal crime.  He abused his position of authority and he abused the public trust, which is relevant to sentencing.

In light of all of the circumstances in this case, a sentence of 120 months–the Stipulated Guidelines Sentence, and far below the applicable Guidelines sentence of life imprisonment – would be sufficient, but not greater than necessary, to satisfy the goals set forth in Section 3553(a).  Among other things, such a sentence would:

- take into account and reflect the nature and circumstances of the offense and Meltz's own history and characteristics reflecting the extraordinarily serious nature of the crimes committed and the importance of Meltz's role as strategic advisor in those offenses, as well as Meltz's decision to use his law enforcement background to guide the men who he believed were ready and willing to perform gruesome and horrific acts of violence on an identified woman; while tempering those factors with considerations of Meltz's years of public service (18 U.S.C. § 3553(a)(1));

- reflect the seriousness of the offenses, which involved, among other things, plans to kidnap, rape, torture, and murder woman and children (18 U.S.C. § 3553(a)(2)(A));

- afford deterrence to others who would engage in such activity—going so far as to collect supplies, including a stun gun – to perform a kidnapping (18 U.S.C. § 3553(a)(2)(B));

- reflect both the Sentencing Guidelines and the pertinent policy statements issued by the Sentencing Commission and it would avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. §  3553(a)(4)-(6)).

## V.     Conclusion

The goals of Section 3553(a), including punishment, deterrence, and recognition of the seriousness of Meltz's crimes, militate in favor of a significant sentence.  In light of all the factors set forth in Title 18, United States Code, Section 3553(a), the policies set forth in the advisory Sentencing Guidelines, the facts set forth in the Presentence Report, the facts that this Court learned at the trial of Van Hise and Asch, and the arguments above, a sentence of 120 months–the maximum permitted by law–would be sufficient but not greater than necessary to comply with the purposes set forth in Title 18, United States Code, Section 3553(a)(2).

Dated:  New York, New York
        August 22, 2014

                                        Respectfully submitted,

                                        PREET BHARARA
                                        United States Attorney for the
                                        Southern District of New York


                                    By:_____/s/_____
                                        Brooke E. Cucinella
                                        Hadassa Waxman
                                        Assistant United States Attorney
                                        Tel.: (212) 637-2477/2277